Fahy v. NH DOS Commissioner, et al.   05-CV-097-SM   03/29/06
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Sr. M. Regina Fahy, RSM;
Haliyamtu Theo Amani;
Sarra Ali; Eva Castillo-Turgeon;
and Annagreta Swanson,
      Plaintiffs

      v.                                Civil No. 05-cv-97-SM
                                        Opinion No. 2006 DNH 038
Commissioner, New Hampshire
Department of Safety,


                        **O R D E R**


      Plaintiffs are New Hampshire residents who are lawfully in

this country, but are not citizens of the United States.  They

bring this action seeking a judicial declaration that certain

written and unwritten policies of the New Hampshire Department of

Safety, Division of Motor Vehicles (the "DMV"), discriminate

against non-citizens in violation of their constitutionally

protected rights.


      Pending before the court are plaintiffs' motion for

preliminary and permanent injunctive relief, defendant's motion

for partial dismissal, and the parties' cross-motions for summary

judgment.

## Standard of Review

To be entitled to permanent injunctive relief, plaintiffs must demonstrate that: (1) they prevail on the merits of their claims; (2) they would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs in the absence of injunctive relief outweighs any harm to the State if an injunction issues; and (4) the public interest would not be adversely affected by the issuance of an injunction. See A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 5 (1st Cir. 1997).

Additionally, because plaintiffs have moved for summary judgment, they must also demonstrate that the record reveals "no genuine issue as to any material fact and . . . [that they are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

**Factual Background**

I.   <u>The Plaintiffs</u>.

Plaintiff Sister M. Regina Fahy ("Fahy") is a citizen of the Republic of Ireland.  She resides in Manchester, New Hampshire.  She is a legal permanent resident and has lived in New Hampshire continuously since 1975.  She has had a New Hampshire driver's license since 1980.  Until April of 2004, Sister Fahy routinely renewed her license at the Manchester DMV substation.  When she went to renew her license in April of 2004, she was told she would have to go to the DMV's main office in Concord because she is a non-citizen.  Sister Fahy went to Concord the next day with her then-current driver's license and her social security card, but says she was told by the person at the non-citizens' window that the documentation she provided was not sufficient.

Eventually, on her third attempt to renew her license, Sister Fahy was successful.  She paid a $50.00 fee and was given a yellow, handwritten, 45-day temporary permit with no picture.  Sister Fahy says she found both the process and the temporary permit to be personally embarrassing and humiliating.  As a result, she chose not to drive until she received her standard,

3

laminated license in the mail.  When she did receive her standard
driver's license, she discovered that rather than being valid for
the statutorily prescribed five-year term, it expired in two
years and nine months.  The State says the expiration of Sister
Fahy's license coincides with the expiration date on the
immigration documentation she provided to DMV employees – that
is, the license period was coextensive with her apparent
authorized stay in this country.  Sister Fahy's current driver's
license does not have a blue bar beneath her picture.[1]

Plaintiff Haliyamtu Theo Amani ("Amani") is a citizen of the
Democratic Republic of the Congo and, like Sister Fahy, resides
in Manchester.  Amani arrived in New Hampshire in 1990 and was
granted refugee status in 1997.  He obtained his first New
Hampshire driver's license at the Manchester DMV substation and,
until April of 2002, he was able to renew it there.  When Amani
went to Manchester in April of 2002 to renew again, he saw a sign
directing all non-citizens to Concord.  That same day, he went to

_____

[1] A blue bar appears beneath the photo of any driver who
has been issued a duplicate license.  Several plaintiffs,
however, have a blue bar beneath their photos, even though they
have not been issued a duplicate license.  Those plaintiffs are
concerned that the blue bar somehow indicates their immigration
status.

Concord and was directed to a line for non-citizens. Upon reaching the window, he discovered that in addition to being required to prove his identity and citizenship status, he was also required to show proof of residency. Amani returned to Concord another day with the appropriate documents and was given a yellow, handwritten, temporary driver's permit with no picture. When he asked why he had been issued a temporary permit, he says he was told that the DMV had to investigate all non-citizens.

Since April of 2002, Amani has been required to renew his driver's license every year. According to the State, this is because Amani's visa indicates that he was admitted to this country as a refugee, for an indefinite period of time. And, at least until recently, the State required non-citizens with "indefinite" status to renew their licenses annually.[2] Each time he has renewed his license, Amani says he has been required to present documents proving his identity, immigration status, and New Hampshire residency. Each time, he says, he has received a

---

[2] That practice has, however, stopped. Now, the State issues a five-year driver's license to any non-citizen resident with "indefinite" status. See Exh. C-1 to defendant's memorandum (document no. 40), "Clarification of the Pilot Program" (April 27, 2005).

yellow 45-day temporary permit and only later received a standard driver's license, albeit one that expired in ten and one-half months.

Although he has never requested a duplicate license, Amani's license bears a blue bar below his photograph. The State explains that this is because with each annual renewal of his license, Amani was charged only $10, rather than the typical $50 renewal fee. In essence, says the State, his renewal was processed (and he was charged) as if it were for a duplicate license. The benefit to Amani is plain: he was charged a far lower fee. But, because his application was routinely treated as one for a duplicate license, the system employed by the DMV produced it with the blue bar that is displayed on all duplicate licenses.

Plaintiff Sara Ali ("Ali") is a citizen of Sudan and was granted asylum in the United States in 2002. She, too, resides in Manchester. Ali first attempted to obtain an original New Hampshire driver's license in January of 2003. DMV personnel told Ali that in order to prove residency, she would have to

produce utility bills in her name, a social security number, a letter from her employer, and a car registered in her name. She apparently produced the requisite documentation and, after two unsuccessful attempts, Ali passed the practical driving test on March 19, 2003. She was given a yellow, handwritten, 45-day temporary permit with no picture.

Eventually, Ali's standard, laminated license came in the mail. But, that license was scheduled to expire less than nine months after it was issued. And, she says that when she renewed that license, the new one expired less than four months after it was issued. Her current license is valid for a period of one year. Each time Ali has renewed her driver's license, she has been issued a yellow 45-day temporary driver's permit. Although she has never requested a duplicate license, her current license (as well as the previous one) bears the blue bar beneath her photograph.

According to the State, Ali's initial licenses were issued with a one-year expiration date because the documentation she presented in support of each renewal application was a work

authorization card, which was valid for only one year. Her driver's license expiration date was, therefore, linked to that date. But, when she eventually presented documentation that she had been granted indefinite asylum status, the State says her driver's license expiration date was extended to the customary five years from the date on which she originally paid the full $50 licensing fee. Because a new license had to be issued (including, among other things, a new expiration date), she was charged the $10 "duplicate license" fee and, accordingly, her license bears the blue bar at the bottom.

Plaintiff Eva Castillo-Turgeon ("Castillo-Turgeon") is a citizen of Venezuela and is a legal permanent resident who has lived in the United States for several years, most recently returning with her U.S.-born husband and children in 1999. She has resided in New Hampshire since 2000 and currently lives in Manchester. Castillo-Turgeon applied for her original driver's license at the Manchester DMV in May of 2001 and was issued a license that expired in November of 2001 (when her work permit expired). When she returned to Manchester to renew her license

8

in November of 2001, Castillo-Turgeon was told she would have to go to Concord.

In Concord, Castillo-Turgeon was directed to a line for non-citizens and was able to renew without being required to show proof of identity, immigration status, or residency. She was issued a license that expired in four years. Although she has never requested a duplicate license, her license bears the blue bar beneath her photograph. The State says that, as was the case with other plaintiffs, when Castillo-Turgeon returned to the DMV to renew her license, she was credited with having paid the full $50 license fee in May of 2001, she was issued a new license that expired five years from that date (i.e., May, 2006), and she was charged only the $10 "duplicate license" fee (which, again, explains the blue bar on her license).

Plaintiff Annagretta Swanson ("Swanson") is a citizen of Germany and is a legal permanent resident who has lived in the United States continuously since 1965. She currently lives in Peterborough, New Hampshire. Swanson has had a New Hampshire driver's license since 1973. In November of 2001, she attempted

to renew her license at the Milford DMV substation, where she was told that she would have to go to Concord. That day, Swanson drove to Concord and was directed to the non-citizen line where, after providing the appropriate documents, she was given a yellow 45-day temporary permit. Swanson says she asked the DMV employee why she did not receive the standard New Hampshire driver's license and claims that he told her, in a voice loud enough to be overheard by many other people, that she was "under investigation" – a remark that caused Swanson to feel personally embarrassed and humiliated.

Swanson received her standard, laminated driver's license in the mail. It expired on January 8, 2006, and, since she paid the full licensing fee, her license did not have a blue bar beneath her picture.

II. Challenged State Practices.

Plaintiffs challenge both written and unwritten practices of the DMV that they claim unconstitutionally discriminate against them as non-citizens. Specifically, they seek temporary and

permanent injunctive relief against the State, prohibiting it from enforcing the following policies:

1.  The regulatory requirement set forth in Saf-C 1002.06(b) which provides that "all non-United States citizens applying for an original or renewal driver license shall appear only at the Division of Motor Vehicles [in] Concord, N.H."

2.  The requirement that all non-citizen applicants for an original driver's license take a road skills test, even if they are surrendering a valid driver's license from another state, while similarly situated citizens of the United States need only take such a test under limited circumstances. Saf-C 1003.04(a)(3).

3.  The requirement that, if a non-citizen does not hold a driver's license from his or her home country, he or she must provide documentation from the home country that demonstrates either: (a) the applicant has never held a driver's license; or (b) that the applicant has held a driver's license in the United States.  Saf-C 1003.04(c).

4.  The practice of issuing a 45-day paper driving permit to non-citizen applicants for original driver's licenses, when citizens receive a 6-month laminated photo-I.D. temporary license.  Saf-C 1003.04(e)

5.  An allegedly unwritten policy of requiring non-citizens to renew their driver's licenses more frequently than the statutorily required five (5) years.

11

6.   An allegedly unwritten policy imposing on non-citizens more onerous requirements regarding proof of N.H. residency, even when they are merely renewing an existing N.H. driver's license.

III. <u>The State Regulations</u>.

The New Hampshire Department of Safety, Division of Motor Vehicles, has enacted administrative rules which include licensing requirements for non-United States citizens ("non-citizens").  In September of 2001, the DMV began requiring non-citizens to go to Concord to obtain and renew their driver's licenses.  And, as part of that program, it assigned two document examiners, each of whom has foreign language expertise and additional training in document identification, to the non-citizen post in Concord.  The DMV rules pertaining to non-citizens were formalized in 2004.

One of the challenged administrative regulations – Saf-C 1002.06(b) – requires all non-citizens applying for either an original or a renewal driver's license to appear at the Concord DMV office.  And, Saf-C 1003.04(a) requires non-citizens applying for an original driver's license to complete a road skills test, even if they hold (and are surrendering) a valid driver's license

from another state.  Citizens of the United States in a similar position need not complete a road skills test.

If an applicant presents a driver's license from his or her home country, Saf-C 1003.04(b) requires the Director to assess whether the license is genuine, whether it was actually issued to the applicant, and whether it is under suspension or revocation. If an applicant does not possess a license from his or her home country, Saf-C 1003.04(c) requires him or her to provide verification from the home country that he or she (1) has never held a driver's license; or (2) has held a driver's license in the United States – documentation that plaintiffs say is virtually impossible to obtain since, presumably, few countries actually keep such records relating to citizens living abroad.

The administrative regulations further provide that a 45-day temporary permit shall be issued to non-citizen applicants upon receipt of the necessary forms and materials.  Saf-C 1003.04(e). And, Saf-C 1003.04(g) provides that driver's licenses shall be valid for up to 5 years or until the date the applicant's visa,

I-20 form, DS-2019 form, or employment status expires, whichever occurs first.

In January of 2005, the DMV began a "pilot program" which permits any permanent resident, refugee, or asylee with indefinite status, who has completed one original or one renewal application in Concord, to renew a driver's license at any DMV substation. That pilot program was clarified or supplemented on April 27, 2005, when the Supervisor of the Bureau of Driver Licensing issued a memo to all DMV employees. Attachment 1 to Haynes Aff., Def.'s Ex. F.[3]

Currently, then, the DMV administrative regulations, as amended and supplemented by the provisions of the "pilot program," provide that:

1.    Any permanent resident, refugee, or asylee seeking to renew a driver's license that was originally issued <u>before</u> September 11, 2001,

_____

[3]    The State has committed to permanently enforce the provisions of the "pilot program" and, for that reason, says it should not be regarded as either a temporary or experimental program. <u>See</u> Exh. O to defendant's memorandum, testimony of Virginia Beecher before the Joint Legislative Committee on Administrative Rules. <u>See also</u> Exh. X to defendant's memorandum (proposed amendments to DMV administrative regulations).

must do so at the Driver Licensing Office in Concord. Any subsequent renewals, however, may be done at any Driver Licensing office.

2. Any permanent resident, refugee, or asylee who was issued an original or renewal license <u>after</u> September 11, 2001, may renew that license at any Driver Licensing Office; there is no longer any requirement that the applicant appear exclusively in Concord.

3. There is no longer any requirement that non-citizen applicants for renewal licenses prove their residency, unless there is some reason to believe that there has been a change in residence.

4. Non-citizens who apply for renewal licenses are no longer issued temporary 45-day licenses, though those temporary licenses are still issued to non-citizen applicants seeking an original driver's license.

5. The expiration date for all non-citizens' driver's licenses are linked to the expiration date of the legal status documents they provide when they file their application for an original or renewal license. For licenses that must bear an expiration date sooner than the typical five years, recent legislation authorizes the DMV to pro-rate the $50 statutory fee.

6. If the applicant has an "indefinite" status, he or she will receive a 5-year driver's license.

7. Non-citizens who are in the United States on a temporary basis must continue to apply for original and renewal driver's licenses in Concord.

Among other things, plaintiffs allege that the State's classification by citizenship violates their rights to equal protection of the laws. They request preliminary and permanent injunctive relief barring the enforcement of Saf-C 1002.06, 1003.04, and the uncodified policies they say are being enforced by the DMV. They also seek attorneys' fees, costs, and expenses pursuant to 42 U.S.C. §1988.

The State says plaintiffs' equal protection rights have not been violated because: (1) plaintiffs are not similarly situated in all relevant respects to all other driver's license applicants; (2) even if they are similarly situated, recent congressional enactment of The Real ID Act, Pub.L. 109-13 Div. B, Title II, §§ 201-207 (May 11, 2005)("Improved Security for Drivers' Licenses and Personal Identification Cards"), requires that any alleged equal protection violation be analyzed under the lenient "rational basis" standard of review – a test which the State says its regulations easily pass; and (3) even if the more rigorous "strict scrutiny" test applies, the challenged regulations and policies survive that standard as well.

16

**Discussion**

I.   <u>Plaintiffs' Standing</u>.

As an initial matter, the State asserts that plaintiffs lack standing to assert the claims advanced in their complaint.  The Court of Appeals for the First Circuit has observed that

> Standing involves both constitutional imperatives and prudential considerations.  An inquiry into standing must be based on the facts as they existed when the action was commenced.
>
> To satisfy Article III's "personal stake" requirement vis-a-vis a statutory challenge, the plaintiff bears the burden of demonstrating that (i) she has suffered an actual or threatened injury in fact, which is (ii) fairly traceable to the statute, and (iii) can be redressed by a favorable decision.  Allegations of abstract injury are insufficient to make out an injury in fact.  Instead, the plaintiff "must show that he has sustained or is immediately in danger of sustaining some direct injury."

<u>Ramirez v. Sanchez Ramos</u>, 438 F.3d 92, 97 (1st Cir. 2006) (citations omitted).  The court went on to note that, "[i]n general – there are exceptions, but we need not discuss them here – prudential concerns require a plaintiff to show that she is seeking to protect her own legal rights (rather than those of a third party), that her complaint does not merely represent a

17

generalized grievance, and that the complaint falls within the zone of interests protected by the law invoked." Id. at 98.

In this case, none of the plaintiffs alleges that he or she was required take a road skills test despite the fact that he or she surrendered a valid driver's license from another state. See Saf-C 1003.04(a)(3). Nor does any plaintiff allege that he or she was required to provide documentation from his or her home country attesting to the fact that either: (1) the applicant never held a driver's license in that country; or (2) the applicant has held a driver's license issued by another state. See Saf-C 1003.04(c). Consequently, none of the plaintiffs has standing to challenge those two administrative rules.[4]

As to plaintiffs' remaining claims, however, it is clear that they do have standing. For example, several plaintiffs have

---

[4] As an aside, the court notes that the record suggests that the State is not enforcing the former of those administrative requirements against non-citizens. That is to say, those who surrender a driver's license from another state are not required to take a road skills test. See, e.g., Defendant's memorandum in support of summary judgment (document no. 40) at 5 ("Non-U.S. citizens that present a valid driver license from out of state are treated the same as citizens in regards to any requirement that a road test be taken.") (citations omitted).

18

testified in affidavits that they were required to drive to the DMV main office in Concord to process license renewals, as required by Saf-C 1002.06(b). Similarly, Sister Fahy and Amani both testified that, when they sought to renew their expired New Hampshire driver's licenses, they were issued 45-day paper driving permits. See Saf-C 1003.04(e). And, Ali testified that when she applied for an original driver's license, she too was initially given a 45-day paper driving permit. Finally, plaintiffs have adequately alleged that they were required to renew their driver's licenses more frequently than the five-year statutory period, and that they were subjected to onerous requirements regarding proof of residency, even when they were simply renewing an expired New Hampshire driver's license. As to those claims, then, plaintiffs plainly have standing.

II. Mootness of Plaintiff's Claims.

Next, the State asserts that, in light of the changes made to licensing procedures applicable to non-citizens, plaintiffs' claims have been rendered moot. Plaintiffs, on the other hand, point out that, while the State's decision to voluntarily stop its arguably unconstitutional practices is certainly a factor to

19

be considered, it does not, standing alone, automatically render plaintiffs' claim moot.  The court agrees.  As the Supreme Court has noted:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982).  In support of their view that the court should consider their claims on the merits and issue appropriate injunctive relief, plaintiffs point out that the recently-adopted policies of the State have not been uniformly adopted and/or applied at the various DMV substations.

> [Plaintiffs'] experiences [in attempting to renew their driver's license] demonstrate exactly the opposite of what the Commissioner contends:
>
> **Sara Ali:** Ali renewed her license in April, 2005, in Manchester.  She received a license good for only three years, not the five required by RSA 263:10 for adult citizens.
>
> **Theo Amani:** Amani renewed his license in April, 2005, in Manchester.  He was once again required to produce

his immigration papers, despite his protest that they were already in the DMV file.

**Annagreta Swanson:** Swanson tried to renew her license on November 15, 2005. Because her alien registration card was due to expire in January, 2006, the DMV refused to issue a renewal license valid for any longer than two months. This despite the Commissioner's assertion that, under the pilot program, aliens of indefinite duration status would be issued five-year licenses. Swanson was finally issued a five-year renewal license only after she renewed her "green card."

**Eva Castillo-Turgeon:** Castillo-Turgeon renewed her license on November 4, 2005. The DMV personnel demanded to see her immigration documents.

Plaintiffs' memorandum in opposition to summary judgment (document no. 43) at 22 (citations omitted).

Given the apparent inconsistency with which DMV personnel have been applying the revised licensing procedures applicable to non-citizens, the court concludes that it is appropriate and would be beneficial to address plaintiffs' claims on the merits and clarify the respective constitutional rights and obligations of the parties.

III. <u>Equal Protection</u>.

The Equal Protection Clause of the Fourteenth Amendment provides that "[no] State [shall] deprive any person of life,

21

liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court has interpreted this clause to require that "all persons similarly circumstanced shall be treated alike." Plyler v. Doe, 457 U.S. 202, 216 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)).

It is well settled that aliens, even those whose presence in this country is unlawful, are "persons" entitled to equal protection and due process of law under the Fifth and Fourteenth Amendments. Plyler, 457 U.S. at 202. The Plyler Court ruled that a Texas law restricting enrollment in public school to children of U.S. citizenship violated the equal protection rights of undocumented school-aged children. In so holding, the Court noted that:

> The term "person," used in the Fifth Amendment, is broad enough to include any and every human being within the jurisdiction of the republic. A resident, alien born, is entitled to the same protection under the laws that a citizen is entitled to. He owes obedience to the laws of the country in which he is domiciled, and, as a consequence, he is entitled to the equal protection of those laws.

Plyler, 457 U.S. at 213 (quoting Wong Wing v. United States, 163 U.S. 228, 242 (1896) (Field, J., concurring)).

While acknowledging that plaintiffs are entitled to the protections afforded by the Due Process Clause of the Fourteenth Amendment, the State argues that non-citizens are not similarly situated to U.S. citizens when it comes to driver's licenses. Among other things, the State says this is because non-citizens "have a plethora of different documents to demonstrate their status that are different than what must be processed for a citizen."  Defendant's memorandum (document no. 11) at 17.  The State also points to communication and accommodation barriers which contribute to substantial differences in processing license applications filed by non-citizens (though plainly communication and accommodation barriers are not issues uniquely presented by non-citizens; some United States citizens from Puerto Rico or citizens who were recently naturalized, for example, might have difficulty communicating in English).

In analyzing an equal protection claim, the Court must "determine the proper standard under which to review the

classification and then analyze the purpose of the legislation to determine whether it satisfies the standard." Richard v. Hinson, 70 F.3d 415, 417 (5th Cir. 1995) (citing United States R. Retirement Bd. v. Fritz, 449 U.S. 166, 174 (1980)). The two traditional tests used are "strict scrutiny" and "rational basis."

Typically, if a legislative classification violates a fundamental right or has the effect of impairing members of a suspect class, then the court must apply strict scrutiny. Id. (citing San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1 (1973)). For legislation to be held constitutional under the strict scrutiny test, the government bears the substantial burden of proving that its classification is both "narrowly tailored" and designed to further a "compelling governmental interest." Johnson v. California, 125 S. Ct. 1141, 1146 (2005).

If, on the other hand, the legislative classification does not disadvantage a suspect class or violate a fundamental right, the State need only demonstrate that the legislative classification "bears a rational relationship to the furtherance

24

of a legitimate governmental purpose." <u>Gary S. v. Manchester Sch. Dist.</u>, 374 F.3d 15, 22 (1st Cir. 2004) (citing <u>Reagan v. Taxation with Representation of Washington</u>, 461 U.S. 540, 547 (1983)).  There is a strong presumption of validity when a statute is analyzed under rational basis review.  As the Supreme Court has explained:

> [R]ational basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness or logic of legislative choices.  Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines. . . Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.  Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification.  Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

<u>Heller v. Doe</u>, 509 U.S. 312, 319-320 (1993) (internal quotations and citations omitted).

Plaintiffs argue that strict scrutiny review must be applied to all of the challenged DMV regulations and uncodified policies

because resident aliens constitute a suspect classification. They also assert that strict scrutiny must be applied because, among other things, the challenged DMV rules violate plaintiffs' fundamental right to equal protection. The State disagrees, asserting that due to the recent enactment of federal law on the subject – The Real ID Act – the challenged DMV rules are subject only to rational basis review. In the alternative, the State insists that the regulations survive even strict scrutiny review.

At this juncture, it is probably appropriate to note the scope of the authority possessed by the states to enact laws and administrative regulations that treat citizens and non-citizens differently, as contrasted with the broader authority possessed by Congress in that area. First, the Supreme Court has consistently recognized the predominant authority of the federal government to regulate aliens within the United States. Toll v. Moreno, 458 U.S. 1, 10 (1982). Congress derives its power from "the Federal Government's power to establish a uniform Rule of Naturalization, U.S. Const., Art. I, § 8, cl. 4, its power to regulate Commerce with foreign Nations, id., cl. 3., and its broad authority over foreign affairs." Toll, 458 U.S. at 10

26

(internal quotations and punctuation omitted).  And, based on its broad power over immigration and naturalization, Congress has the authority to treat aliens differently from citizens.  The fact that Congress chooses to exercise that power does not alone qualify such disparate treatment as "invidious."  Mathews v. Diaz, 426 U.S. 67, 78 (1976) (provision of Social Security Act that grants Medicare benefits to certain resident citizens over 65, but not to aliens over 65 unless they have been permanent residents of the U.S. for a minimum of five years does not violate Equal Protection Clause).  The Court explained that "[t]he fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification."  Id.

With regard to the authority possessed by the states, the Court has also long recognized substantial limitations on the authority of the states to make similar classifications.  So, for example, in Takahashi v. Fish & Game Com'n, 334 U.S. 410 (1948),

27

the Supreme Court declared unconstitutional a California statute that precluded aliens who were ineligible for U.S. citizenship from obtaining commercial fishing licenses.  California attempted to defend the statute by arguing that it had "simply followed the Federal Government's lead in adopting that classification from the naturalization laws."  Id. at 418).  The Court rejected that argument, noting:

> The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization.  Under the Constitution the states are granted no such powers; they can neither add to nor take away from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states.  State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid.

Takahashi, 334 U.S. at 419 (citation and footnote omitted) (quoted in Toll, 458 U.S. at 11) (emphasis omitted).


Following Takahashi, the Supreme Court took the equal protection analysis a step further, establishing the general rule

28

that state "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." Graham v. Richardson, 403 U.S. 365, 372 (1971) (Pennsylvania statute denying resident aliens welfare benefits and Arizona statute denying welfare benefits to resident aliens living in U.S. less than fifteen years both violate Equal Protection Clause). The Court explained that "[a]liens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate." Id. (citation omitted).

Since Graham, the Court has been consistent in applying strict scrutiny to state laws creating classifications by alienage. Soskin v. Reinertson, 353 F.3d 1242, 1250 (10th Cir. 2004). See, e.g., Bernal v. Fainter, 467 U.S. 216, 219-220 (1984) (Texas law requiring U.S. citizenship for state notaries public subject to strict scrutiny); Examining Bd. v. Flores de Otero, 426 U.S. 572, 601-602 (1976) (same for Puerto Rico law requiring U.S. citizenship to obtain engineer license); In re Griffiths, 413 U.S. 717, 721 (1973) (same for Connecticut law requiring U.S. citizenship for membership in State Bar); Sugarman

29

v. Dougall, 413 U.S. 634, 642 (1973) (same for New York law requiring U.S. citizenship for competitive state civil service positions).

Importantly, however, in De Canas v. Bica, 424 U.S. 351 (1976), the Court upheld a section of the California Labor Code, which prohibited California employers from knowingly employing illegal aliens when that employment would adversely affect resident workers. The Court found that the statute was not invalid under the Supremacy Clause because Congress had not "unmistakably ordained" exclusive federal regulation in the field of employment of illegal aliens; on the contrary, the Court held that amendments to the Farm Labor Contractor Registration Act were evidence that "Congress intends that States may, to the extent consistent with federal law, regulate the employment of illegal aliens." Id. at 361. The Court reiterated this principle in Plyler, holding that when:

> [f]aced with an equal protection challenge respecting the treatment of aliens, we agree that the courts must be attentive to congressional policy; the exercise of congressional power might well affect the State's prerogatives to afford differential treatment to a particular class of aliens. . . . [T]he States do have some authority to act with respect to illegal aliens,

30

> at least where such action mirrors federal objectives
> and furthers a legitimate state goal.

457 U.S. at 225.

Together, these cases "stand for the broad principle that 'state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress.'" Toll, 458 U.S. at 12-13 (quoting De Canas, 424 U.S. at 358 n.6). But, on the other hand, state laws enacted pursuant to congressional authorization – even if those laws impose unequal burdens on non-citizens – are subject to rational basis review. See Soskin, 353 F.3d at 1254-55.

IV.  The Real I.D. Act.

Here, the State asserts that the DMV regulations and policies at issue are authorized by Congress and, therefore, subject to the more relaxed "rational basis" standard of review. Specifically, the State points to the provisions of the Real ID Act which, among other things, state that, "[b]eginning 3 years after the date of the enactment of this division [May 11, 2005],

31

a Federal Agency may not accept, for any official purpose, a driver's license or identification card issued by a State to any person unless the State is meeting the requirements of this section." Pub. L. 109-13 Div. B, Title II, § 202(a)(1). The Act goes on to provide that:

> To meet the requirements of this section, a State shall require, at a minimum, presentation and verification of the following information before issuing a driver's license or identification card to a person:
>
> (A)   A photo identity document, except that a non-photo identity document is acceptable if it includes both the person's full legal name and date of birth.
>
> (B)   Documentation showing the person's date of birth.
>
> (C)   Proof of the person's social security account number or verification that the person is not eligible for a social security account number.
>
> (D)   Documentation showing the person's name and address of principal residence.

Id. at § 202(c)(1). Additionally, with regard to five categories of resident aliens, the Real ID Act provides that states may issue only temporary driver's licenses or temporary identification cards. Id. at § 202(c)(2)(C).[5]

_____

[5]    The five categories of non-citizens to whom only temporary driver's licenses or identification cards may issue are: (1) holders of non-immigrant visas; (2) those with pending

To comply with the Act, states must also implement the following procedures:

> (A)  Before issuing a driver's license or identification card to a person, the State shall verify, with the issuing agency, the issuance, validity, and completeness of each document required to be presented by the person under paragraph (1) or (2).
>
> (B)  The State shall not accept any foreign document, other than an official passport, to satisfy a requirement of paragraph (1) or (2).

Id. at § 202(c)(3). Finally, and perhaps most significantly for this litigation, the Act mandates that states establish "an effective procedure to confirm or verify a renewing applicant's information," id. at § 202(d)(4), and provide "fraudulent document recognition training programs for appropriate employees engaged in the issuance of driver's licenses and identification cards," id. at § 202(d)(9).

---

applications for asylum in the United States; (3) those with an application for temporary protected status in the U.S.; (4) those with approved deferred action status; and (5) those with a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the U.S. Id. at § 202(c)(2)(B)(v)-(ix).

In summary, then, the Real ID Act was enacted to ensure that several states issue photographic identification cards only to people who are who they claim to be. That is to say, the Act is concerned exclusively with preventing fraud in connection with the acquisition of state-issued identification cards. It was not enacted to require (or even facilitate) a state's "investigation" into whether an applicant is, for example, wanted on criminal charges, appears on so-called terror "watch-lists," or even whether he or she is qualified to drive. Accordingly, to be subject to the more lenient "rational basis" standard of review, the challenged practices of the State must be consistent with Congressional purpose and must fall within the scope of practices specifically contemplated by Congress and mandated by the Act relating to the prevention of identity fraud.

V.   The State's Current Licensing Procedures.

A.   Initial Licensing Exclusively in Concord.

As noted above, non-citizens seeking to obtain an original New Hampshire driver's license, as well as those seeking to renew an existing license that was issued prior to September 11, 2001, must appear at the DMV main office in Concord. Once that license

34

(or renewal license) has issued, however, all subsequent renewals can be done at the applicant's local DMV substation.[6]

The State's justification for imposing this requirement is straightforward: in the wake of the September 11, 2001, attacks on the United States, and given the requirements of the Real ID Act, the State has a federal mandate, if not a legal obligation, to establish "an effective procedure to confirm or verify a renewing applicant's information," id. at § 202(d)(4), and to provide "fraudulent document recognition training programs for appropriate employees engaged in the issuance of driver's licenses and identification cards," id. at § 202(d)(9). See also Id. at § 202(c)(3). It is fair to presume that New Hampshire, and its citizens and residents, want the State's driver's license to be accepted as a reliable form of identification for federal purposes, such as airline travel, etc. That, in turn, requires meeting the Real ID Act's mandates.

--------

[6] All driver's licenses issued prior to September of 2001, were valid for no more than four years and, therefore, they have now expired and, presumably, have already been renewed. Currently, then, only non-citizens applying for an original driver's license must appear at the DMV main office in Concord; non-citizen license renewals may now be processed at any one of the seventeen local DMV substations.

35

For non-citizens, the documentation submitted in support of a license application includes passports issued by any one of nearly 300 countries, as well as a myriad of legal status documents issued by the Immigration and Naturalization Service. To ensure that such documents are authentic, the State has hired two document experts, who are stationed at the DMV main office in Concord and who have been trained to recognize the numerous documents that might be presented in support of a non-citizen's license application as well as to recognize potentially fraudulent documents.

Plainly, this system treats non-citizens differently. But, it is equally plain that the State's system is entirely consistent with the requirements and objectives of the Real ID Act. The requirement that first-time applicants for New Hampshire driver's licenses travel to the Concord DMV office is, therefore, subject to "rational basis" review. Moreover, the State has articulated a rational and reasonable basis for requiring first-time license applicants to appear in Concord. In other words, it has carried its burden of proving a "rational relationship between the disparity of treatment and some

legitimate governmental purpose."  Bd. of Trustees v. Garrett, 531 U.S. 356, 367 (2001).  See also Kimel v. Florida Bd. of Regents, 528 U.S. 62, 84 (2000).

The State has a substantial interest in insuring that driver's licenses are not obtained through the use of false or fraudulent documentation.  To achieve that goal, the Real ID Act imposes several fairly onerous requirements on the State to insure that state-issued photographic identification cards are not obtained through fraud or issued to persons not lawfully in the country.  The number of different documents that non-citizens may supply in support of an application for a driver's license means that those charged with issuing the licenses must be specially trained to recognize those documents and determine their authenticity.  The State can fairly determine that the human and financial resources necessary to place at least one trained person at each DMV substation to recognize and verify the authenticity of documents provided by non-citizens in support of license applications are simply too burdensome, and that it is more efficient and effective to organize review of non-citizen documents in a central location.

37

While some of the practices employed by the DMV when plaintiffs originally filed this suit raise legitimate constitutional concerns, those practices have been substantially altered. The current policies and practices employed by the State relating to the licensing of non-citizens (and re-licensing of non-citizens whose original licenses were issued prior to September 11, 2001), exclusively at the main DMV office in Concord do not violate plaintiffs' constitutional rights. Because each plaintiff has already had one original or renewal license application processed at the main DMV office in Concord, each may now submit future renewal applications locally – in fact, four plaintiffs have already submitted renewal applications at their local DMV substation. Accordingly, plaintiffs are not entitled to an injunction prohibiting the State from enforcing the provisions of Saf-C 1002.06(b) (requiring non-citizens to appear in Concord when they file an application for an original New Hampshire driver's license).

B.    Temporary Licenses.

Under the DMV's administrative regulations, once a non-citizen applicant for an original New Hampshire driver's license

38

submits an application and statutory fee, and satisfactorily completes all appropriate testing, the applicant is issued a temporary, 45-day, paper driving permit. Saf-C 1003.04(e). Plaintiffs also allege that, pursuant to an unwritten policy of the DMV, some DMV employees have been issuing temporary driving permits to non-citizens when they apply to renew an existing, but expired, New Hampshire driver's license. The temporary permit is not laminated, nor does it include a photograph of the licensee. United States citizens, on the other hand, receive a 6-month temporary permit that is laminated and includes the licensee's photograph. See Saf-C 1003.03(c). Given the increasing reliance on state-issued photo identification cards (e.g., for airline travel), plaintiffs complain that they are being unfairly (and unconstitutionally) disadvantaged and discriminated against and, in the process, are being denied an essential form of government-issued identification.

In response, the State says that it has made clear to all DMV employees that temporary driving permits are not to be issued to anyone who is merely renewing an expired New Hampshire driver's license; only applicants for an original New Hampshire

driver's license are issued temporary driving permits, while their applications and supporting documents are being verified. The State also says it is in the process of renegotiating its contract with one of its suppliers so, in the future, the 45-day temporary permits will include a photograph of the permit holder.

As to its policy of issuing the 45-day paper driving permit to non-citizen applicants for original driver's licenses, while United States citizens are issued a 6-month laminated permit bearing a photograph of the holder, the State says its practice is justified by "compelling safety and security interests." Defendant's memorandum (document no. 11) at 11. See also Exh. F to defendant's memorandum, Affidavit of William Haynes, Jr., at para. 11; Exh. G to defendant's memorandum, Affidavit of Arthur S. Garlow, at para. 16. The State does not, however, explain how or why those "security concerns" are unique to non-citizens, nor does it explain why those concerns, whatever they might be, could not be adequately addressed if the State were simply to treat citizens and non-citizens alike and issue both groups the 6-month laminated permit bearing a photo identification. Instead, the State asserts:

40

> On non-U.S. citizen original applications, when the
> non-citizen does not have a license from another state,
> New Hampshire cannot check the non-citizen's driving
> record to see if there are outstanding problems through
> the problem driver pointer system ("PDPS") . . ..  It
> is also not feasible to contact the non-citizens[']
> home country for driving records.

Defendant's memorandum at 3.  Of course, the State faces the
identical problem when a citizen of the United States does not
hold a driver's license issued by another state.  Yet, the State
fails to articulate why its administrative regulations treat a
similarly situated citizen and non-citizen in such a disparate
manner.  Because the State has failed to articulate even a
rational basis for its classification with respect to issuing
temporary permits, and because the court cannot think of one,
plaintiffs are entitled to injunctive relief as to that limited
aspect of the challenged administrative regulations.

These days, state-issued photographic identification cards
serve as a common currency of personal identification and have
become an increasingly essential part of day-to-day life.  Absent
even some rational justification for depriving (albeit
temporarily) resident non-citizens of that essential form of

identification, the State's current practice of issuing non-citizens a paper 45-day permit, while issuing citizens a 6-month laminated photo-I.D. permit, cannot stand.

     C.   Allegedly Unconstitutional "Unwritten Policies."

     Finally, plaintiffs challenge two allegedly unwritten policies of the DMV: (1) a requirement that non-citizens renew their New Hampshire driver's licenses more frequently than the statutory 5-year period; and (2) a requirement that non-citizens provide proof of residency when they are simply renewing an expired (but otherwise valid) New Hampshire driver's license. Some employees of the DMV might well have imposed one or both of the described unwritten policies on one or more of the plaintiffs prior to the filing of this suit, but the State has since remedied that situation.

     First, the State has made clear to all DMV employees that the expiration date of driver's licenses issued to non-citizens must be linked to the expiration date of the legal status documents provided by the applicant.  See Exh. C-1 to defendant's memorandum (document no. 40), "Clarification of the Pilot

Program" (April 27, 2005) ("Expiration dates of driver licenses will be tied to the expiration date of the legal status documents provided by the applicant."). So, for example, if a non-citizen applicant provides documentation demonstrating that he or she may lawfully remain in this country for, say, two years, his or her driver's license will expire at the end of that two-year period. That practice is specifically mandated by the Real ID Act. See id. at § 202(c)(2)(C)(ii).

Additionally, legislation was recently enacted to allow the DMV to pro-rate the $50 license fee, thereby allowing applicants who are eligible for licenses of fewer than 5 years to pay only a pro-rated portion of the 5-year statutory $50 fee (i.e., $10 for each year that the license is valid). See N.H. Rev. Stat. Ann. 263:42 I (effective January 1, 2006). That practice will also eliminate the issue of plaintiffs receiving "duplicate" licenses that bear the blue bar beneath their photographs – a circumstance that was the product of DMV employees' good faith efforts to assist non-citizens, by processing their license renewal applications in a way that implicated a much lower statutory fee than would otherwise apply.

With regard to plaintiffs' claim that some non-citizen applicants for renewal licenses have been required to comply with onerous requirements to demonstrate their residency, the State has addressed that issue as well. As of at least April of 2005, the State has made clear to all DMV employees that, "[t]here is no requirement to prove residency upon renewal unless there is some reasons to believe the address has changed, such as a returned notice of renewal." Exh. C-1 to defendant's memorandum, "Clarification of the Pilot Program." That same rule applies equally to United States citizens seeking to renew their driver's licenses.

In light of the changes recently adopted by the State, plaintiffs are not entitled to injunctive relief with respect to those two allegedly unwritten "policies" of the DMV (expiration dates and proof of residency).

## Conclusion

When plaintiffs originally filed this suit, the State was engaged in several practices that were arguably questionable from a constitutional standpoint. But, to its credit (and perhaps at

44

the urging of plaintiffs' counsel), the State recognized those problems and addressed nearly all of them in ways that both comply with constitutional requirements and protect the security of its citizens by minimizing the opportunity for fraud in connection with the acquisition of New Hampshire driver's licenses.

For the reasons discussed above, plaintiffs lack standing to challenge Saf-C 1003.04(a)(3) (road skills test) and Saf-C 1003.04(c) (documentation from home country). As to plaintiffs' claims concerning Saf-C 1002.06(b) (requiring non-citizens to file original license applications in Concord), as well as those claims concerning the allegedly unwritten policies requiring non-citizens to renew their licenses more frequently than citizens and requiring them to provide more extensive documentation demonstrating their New Hampshire residency, the State is entitled to judgment as a matter of law.

Although the most glaring flaws in the State's licensing program have been remedied, the State continues to issue 45-day temporary driver's permits to non-citizen applicants for original

45

driver's licenses, while it issues six month temporary licenses to similarly situated United States citizens. Because the State has failed to offer sufficient justification for that classification based upon citizenship status, and the concomitant disparate treatment of non-citizens, plaintiffs are entitled to injunctive relief to prohibit the enforcement of the offending administrative regulation.

Accordingly, plaintiffs' motion for preliminary and permanent injunctive relief (document no. 4) is granted in part, and denied in part. It is granted to the extent that the Commissioner of the New Hampshire Department of Safety is hereby enjoined from enforcing the provisions of Saf-C 1003.04(e) (issuance of a 45-day temporary driving permit to non-citizen applicants). In all other respects, however, plaintiffs' motion is denied.

The State's motion for partial dismissal (document no. 17) is, for the reasons set forth in plaintiffs' opposition, denied. The State's motion to exclude plaintiffs' expert (document no. 36) and its motion to strike (document no. 44) are denied as

46

moot.  Plaintiffs' motion for summary judgment (document no. 41) and the State's motion for summary judgment (document no. 40) are both granted in part, and denied in part, consistent with the terms of this order.  For the reasons set forth in defendant's memoranda, plaintiffs' claims based on alleged violations of their constitutional rights to due process and travel are denied. See also Miller v. Reed, 176 F.3d 1202, 1205-06 (9th Cir. 1999).

The Clerk of the court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

March 29, 2006

cc:  Christine C. Wellington, Esq.
     Melanie M. Chaput, Esq.
     Stephanie A. Bray, Esq.
     Nancy J. Smith, Esq.

47